FILED

2005 Nov-15  PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SIERRA INTERNATIONAL          }
MACHINERY, INC.,              }
                             }
     Plaintiff,              }      CIVIL ACTION NO.
                             }      04-AR-3402-S
v.                           }
                             }
BANCPARTNERS LEASING, INC.,   }
et al.,                      }
                             }
     Defendants.             }


## MEMORANDUM OPINION

Before the court are the cross-motions for summary judgment of plaintiff, Sierra International Machinery, Inc. ("Sierra"), and of defendants, AmSouth Bank ("AmSouth"), BancPartners Leasing, Inc. ("BancPartners"), and Bloch Metals, Inc. ("Bloch"). Sierra seeks damages and equitable relief against BancPartners and AmSouth on numerous theories: (1) declaratory relief; (2) breach of contract; (3) breach of implied covenant of good faith and fair dealing; (4) conversion; and (5) breach of fiduciary duty. Sierra also makes a claim for subrogation against Bloch. BancPartners cross-claims against Bloch for breach of contract.

### Summary Judgment Facts[1]

Sierra is a California corporation with its principal place of business in California.  BancPartners is an Alabama corporation with its principal place of business in Tennessee. AmSouth is an Alabama corporation with its principal place of business in Alabama.  Bloch is a Texas corporation with its principal place of business in Texas.  The complicated relationships between these parties, and the claims that have arisen from them, make this controversy hard to describe, much less to resolve.  The court will do its best.

In July 2001, Sierra sold a Sierra 500 ton shear/baler/logger with attachments (the "Baler") to BancPartners for shipment to Bloch.  The purchase price of the Baler was $445,000.  BancPartners leased the Baler to Bloch pursuant to an Equipment Rental Agreement ("Lease") dated June 22, 2001.  The Lease provided that Bloch would make sixty (60) payments to BancPartners of $7,655.04 (plus applicable taxes).  As a condition of the Lease, BancPartners obtained from Sierra a Limited Recourse Guaranty (the "Guaranty"), dated July 7, 2001.

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, and because the parties are simultaneously movants and non-movants with regard to their competing motions, the following statement of facts includes only those facts that are either undisputed or not the subject of a **genuine** dispute based on the evidence before the court.

That same day, BancPartners also obtained from Sierra a Collateral Assignment of Account (the "Assignment").  The Assignment granted BancPartners a security interest in the "Collateral," a sum of money ($96,500 at the time of the Assignment) that was deposited in an account (the "Account") in Sierra's name at Union Planter's Bank.  Under the Guaranty, Sierra "guarantee[d] to [BancPartners] the timely payment and performance" of the "Guaranteed Obligations," which were identified as "the obligations of [Bloch] to [BancPartners] pursuant to the Lease, and all modifications, extensions and renewals thereof...and all obligations of [Bloch] under documents presently or hereafter securing said obligations."  The Guaranty detailed the circumstances under which BancPartners could obtain recourse to the Collateral upon any default on the Guaranteed Obligations and specified that the Collateral was BancPartners' only recourse (except for costs of collection) for such a default.

Several other documents are relevant.  Four letters were sent from BancPartners, or its counsel, to Bloch.  These letters were dated January 21, 2003, May 20, 2003, July 2, 2003, and August 14, 2003.  The parties do not contest that the letters were sent and received, but they do dispute the legal implications of each.  The contents of these letters will be explored in detail in the analysis section below.  Furthermore,

on October 9, 2001, BancPartners and AmSouth Bank ("AmSouth")
executed a Security Agreement and Assignment of Lease (the
"AmSouth Assignment") by which BancPartners granted AmSouth a
security interest in the Lease, all sums due thereunder as of
November 15, 2001, all "Collateral Documents," any of
BancPartners' rights or privileges thereunder and the Baler
itself.  Sierra contends that the AmSouth Assignment has
implications for its claims against BancPartners.  Finally, Bloch
and counsel for BancPartners executed an invoice (the "Closing
Invoice") under which Bloch agreed to pay BancPartners' closing
costs in three installments.  The parties dispute the question of
whether Bloch's failure to abide by the payment schedule of this
invoice constitutes a default under the Lease.

Sierra originally filed suit in this matter in the Middle
District of Tennessee.  The dispute arrived in this court on the
parties' joint motion to transfer venue pursuant to 28 U.S.C. §
1404(a).

### *Analysis*

**CHOICE OF LAW**

As a threshold matter, this court must determine which state
law to apply.  A change of venue under § 1404(a) "generally
should be, with respect to state law, but a change of
courtrooms," and the transferee court must apply "the state law
that would have been applied if there had been no change of

4

venue." *Ferens et ux. v. John Deere Co.*, 494 U.S. 516, 110 S. Ct. 1274 (1990); *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805 (1964).  Therefore, this court must apply Tennessee law for "those laws that might significantly affect the outcome of the case," *Id.* at 639, n.40, including choice of law rules.

"Tennessee applies different choice of law provisions depending on the characterization of the claim." *Savers Fed. Sav. & Loan Assoc. v. Home Fed. Sav. & Loan Assoc.*, 721 F. Supp. 940, 942 (W.D. Tenn. 1989).  "The characterization of [a] claim as a contract claim, a tort claim, or an equitable claim will affect the choice of law rules.  Therefore, the Court must first decide under which conflict of laws analysis this case falls - contract, tort, or both." *Chase Manhattan Bank, N.A. v. CVE, Inc.*, 206 F. Supp. 2d 900, 905 (M.D. Tenn. 2002).  If tort and contract claims are both present, "the court must look at the 'basic' question of the case." *Savers*, 721 F. Supp. at 942; *see also Bonee v. L & M Constr. Chems.*, 518 F. Supp. 375, 379 (M.D. Tenn. 1981).  Even in cases where the basic question lies squarely in either contract, tort, or equity, different state laws may be applied for different claims.  *Chase Manhattan*, 206 F. Supp. 2d 900.

The core question in the instant case is a contract question.  The relationship between the parties centers on three contracts, the Lease, the Guaranty, and the AmSouth Assignment.  Sierra's tort and quasi-contract claims are essentially connected

to these contracts.  If, for example, defendants acted in accordance with their duties under the contracts, no action for conversion will lie.  Similarly, the resolution of the contract issues will determine the outcome of the subrogation and unjust enrichment claims.  Thus, determining which law applies to the contracts should tell us what law applies to the tort and quasi-contract claims as well.

The primary difficulty here is the existence of conflicts between the choice of law provisions in the Lease, the Guaranty, and the Assignment.  Under Tennessee law, contractual choices of law are enforceable so long as the choice is made in good faith and not as a "sham or subterfuge." *Goodwin Bros. Leasing, Inc. v. H & B, Inc.*, 597 S.W.2d 303, 305, 1990 Tenn. LEXIS 440, 448-49 (Tenn. 1980) (Under "the settled law of Tennessee...parties ordinarily are free to contract that the law of some other jurisdiction than that of the place of making will govern their relationship."); *Chase Manhattan*, 206 F.Supp.2d at 905.  As there is no indication of bad faith or subterfuge here, the contractual choice of law provisions in each of the three contracts will be honored.  Therefore, the Lease is to be governed by Alabama law, the Guaranty is to be governed by Tennessee law, and the AmSouth Assignment is to be governed by Tennessee law with regard to validity, construction, and enforcement and "by the terms of the Lease"(*i.e.* Alabama law) for matters of jurisdiction, venue, dispute resolution, and similar matters.

For Sierra's non-contract claims, the court must determine which of the three contracts each claim is most closely connected to.  Thus, Sierra's subrogation claim against Bloch is governed by Tennessee law because the subrogation was created by the Guaranty.  Similarly, the claim for breach of the implied covenant of good faith and fair dealing on the Guaranty is governed by Tennessee law.

Sierra also makes a claim in tort for conversion.  With respect to tort claims, Tennessee has rejected the *lex loci delicti* conflict of laws doctrine in favor of the "most significant relationship" approach favored by the Restatement (Second) of Conflict of Laws (1971).  *Hataway v. McKinley*, 830 S.W.2d 53, 54 (Tenn. 1992) ("the *lex loci delicti* principle should be abandoned").  Under the Restatement approach, a court applies the "law of the state where the injury occurred unless, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties."  *Id.* at 57.  To determine which state has the most significant relationship, this court must take into account: "(a) the place where the [alleged] injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, [and] (d) the place where the relationship, if any, between the parties is centered."  *Id.*; RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971).  This analysis presents a close question,

but after weighing the above factors, Tennessee law has the most significant relationship to the conversion claim, which effectively arises out of the alleged breach of the Guaranty.

Finally, Sierra's claim for breach of fiduciary duty hinges on whether a fiduciary relationship was created by the Guaranty. Therefore, the breach of fiduciary duty claim will be assessed based on the Tennessee law that governs the Guaranty.

**DECLARATORY JUDGMENT**

In its First Amended Complaint, Sierra seeks declaratory judgment from this court on thirteen issues. This court addresses these requests for declaratory relief first for the sake of clarity and because many of Sierra's other claims will turn on the court's declarations.

***Default under the Lease***

Sierra requests a declaration on the question of whether Bloch was in default under any obligations to BancPartners or AmSouth. An Event of Default under the Lease occurs when Bloch "fail[s] to pay any rent or other sum payable hereunder on the date thereof." In addition to rent, the Lease requires Bloch to "PAY, WHEN INVOICED, PERSONAL PROPERTY TAXES." Lease, ¶ 8 (capitalization in original).

On October 19, 2001, BancPartners invoiced Bloch for $6,535.97 in property taxes for tax year 2002, with a due date of

October 31, 2001.  Bloch paid this amount on January, 30, 2002.
On October 15, 2002, BancPartners invoiced Bloch for property
taxes in the amount of $5,742.74, to accrue in tax year 2003,
with a due date of October 31, 2002.

Bloch contends that BancPartners was not permitted to
invoice property taxes before the taxes were assessed by the
relevant tax assessors.  In support of this proposition, Bloch
cites the deposition testimony of BancPartners President, Walter
Hawkins ("Hawkins"), who agrees that BancPartners did not have
the right to invoice Bloch for all personal property taxes for
every year in which the lease was in effect.  In other words,
Hawkins stated that BancPartners was not permitted to bill Bloch
for personal property taxes for 2001, 2002, 2003, 2004, 2005 and
2006 all at once, up front.  Hawkins explained that this was
because "the assessment hadn't occurred for those previous
years."  Bloch maintains that the taxes invoiced in October of
2001 were not due until January of 2003, and the taxes invoiced
in October of 2002 were not due until January of 2004.  Based in
part on this, Bloch maintains that its failures to pay property
taxes when invoiced were not defaults.

Hawkins' statement notwithstanding, the plain language of
the contract indicates that Bloch was required to pay the
property taxes when they were invoiced on October 15, 2002, and
there was no contractual obligation on BancPartners to wait for
the Smith County tax assessment before invoicing Bloch.  The

contractual language is unambiguous: "LESSEE SHALL PAY, WHEN INVOICED, PERSONAL PROPERTY TAXES."  This is one of only a handful of Lease provisions that are capitalized for emphasis, and it is the only emphasized language in ¶ 8 of the Lease, which deals with Taxes, Assessments and Fees.  The emphasis makes it clear that the parties gave this clause special attention.  Despite this attention, the parties opted not to articulate guidelines for when invoicing is appropriate, indicating that the language means what it says: Bloch is required to pay property taxes *when invoiced*.

Examining the record in the light most favorable to Bloch, as it must, this court finds no genuine issue of material fact on the issue of the back-paid taxes.  As a result, this court declares that Bloch's failure to timely pay property taxes when invoiced constituted an Event of Default under the Lease.

### *Declaratory Judgment on Questions Arising from Paragraph 34 of the Guaranty*

Sierra next seeks declaratory judgment on a number of critical sub-questions that essentially ask whether and when the Guaranty terminated and whether BancPartners timely commenced its remedies for default under the Guaranty.  Paragraph 34 of the Guaranty governs termination.  It specifies that the Guaranty terminates when (a) the Guaranteed Obligations are paid in full or the Lease is terminated by mutual agreement, or (b) two years

from the date of the Guaranty, *unless* within those two years BancPartners commences exercise of its remedies under Section 18 of the Lease as a result of a Material Default *or* BancPartners provided notice of a Material Default within two years and then commenced Section 18 remedies within 45 days of the notice.

The court looks first at 34(a).  The Guaranteed Obligations are defined in the Guaranty as the "obligations of [Bloch] to [BancPartners] pursuant to the Lease...and all obligations of [Bloch] under documents presently or hereafter securing said obligations."  Bloch was required by the Lease to pay rent, closing costs and property taxes.  The Lease requires rental payments for a term of sixty (60) months from the Lease's commencement date of July 19, 2001, meaning that payments are required until at least July of 2006.  Since the Guaranteed Obligations include all of Bloch's obligations under the Lease, the Guaranteed Obligations will not be paid in full until the rental payments are fully paid, which will not occur until at least July 2006.  In addition, Bloch did not fulfill its Guaranteed Obligations because it failed to timely pay property taxes, and one of Bloch's obligations under the Lease is to pay its debts as they come due.

Additionally, the Lease was not terminated by the mutual agreement of Bloch and BancPartners.  No evidence in the record supports the proposition that the Lease was terminated by mutual agreement, and no party maintains that the Lease was so terminated.

11

The court now turns to 34(b) of the Guaranty.  The present date is, of course, more than two years from the date of making of the Guaranty, which was executed on July 7, 2001.  Absent an exercise of Section 18 remedies by BancPartners within two years of the Guaranty's execution or a notice of default within two years followed by an exercise of Section 18 remedies within 45 days, the Guaranty terminated on July 7, 2003.

The question of whether BancPartners timely commenced its Section 18 remedies requires a determination of whether, within those two years, BancPartners commenced the exercise of its remedies under Section 18 of the Lease as a result of a Material Default or gave Bloch notice of a Material Default and thereafter commenced exercise of its Section 18 remedies within 45 days of the notice.

As a preliminary matter, this court finds that there was a Material Default.  "Material Default" under the Guaranty has effectively the same definition as "Event of Default" under the Lease: "Lessee's failure to pay any rent or other sum payable under the Lease on the date such payment is due."[1]  As discussed above, an Event of Default occurred under the Lease because of Bloch's failure to pay property taxes when invoiced, and this failure also constitutes a Material Default under the Guaranty.

---

[1] As articulated above, an "Event of Default" under the Lease occurs when Lessee "fail[s] to pay any rent or other sum payable hereunder on the date thereof."

12

*When, if ever, did BancPartners exercise its Section 18 remedies?*

The court next looks at whether BancPartners commenced the exercise of its remedies under Section 18 of the Lease.  Section 18 reads, in pertinent part:

> 18. REMEDIES.  Upon the occurrence of an Event of Default, Lessor may, in its sole discretion, do any or all of the following (a) terminate this Rental Agreement; (b) as liquidated damages for loss of a bargain and not as a penalty, declare due and payable, the present value of (i) any and all amounts which may be then due and payable by Lessee to Lessor under this Rental Agreement, plus (ii) all payments remaining through the end of the term hereof, plus (iii) the Purchase Option amount, if stated, or if no fixed Purchase Option amount is given, Lessor's reasonable estimate of the fair market value of the Equipment as of the end of the term hereof, all discounted at the higher of seven (7%) percent or the lowest rate allowed by law (collectively, the **"Balance Due"**); (c) require Lessee to make the Equipment available for repossession during reasonable business; (d) peaceably repossess the Equipment; or (e) exercise such other rights as may be allowed by applicable law."  Lessee will not make any claims against Lessor or the Equipment for trespass, damage or any other reason.

BancPartners claims that it exercised its remedies by terminating the Guaranty and accelerating the amounts due thereunder on July 13, 2003, ten days after its letter of July 2, 2003 that was captioned "notice of Default."

The court disagrees.  The record provides no basis for accepting BancPartners's contention that it exercised its remedies on July 13.  Indeed, there is no written indication or notice of any such exercise on that date.  BancPartners maintains that no notice was required for it to commence exercise of its remedies (although it acknowledges that, as a practical matter, it would eventually have to notify Bloch to receive accelerated

payments).  The only support in the record for a July 13 exercise
of remedies is an unsubstantiated legal conclusion in the
deposition of BancPartners President, Walter Hawkins.

The July 2 letter itself does not provide any evidence of an
exercise of remedies by BancPartners.  It merely informs Bloch of
an Event of Default under the Lease and demands full payment
within ten days of the letter.  It goes on to state that, should
Bloch fail to pay within the ten days:

> Lessor must consider such further action as it may deem
> necessary to protect its interests, including, without
> limitation, acceleration of all amounts due under the Rental
> Agreement, repossession of the leased equipment, foreclosure
> of the real property pledged to Lessor under the Deed or
> Trust and/or collection by Lessor under the Guaranty
> Agreements.

It bears emphasizing that the letter does not indicate that
BancPartners would commence its remedies in ten days, but merely
that it would *consider* such remedies.  In this respect, it does
not materially differ from two previous letters sent by
BancPartners to Bloch, which said that BancPartners "could" or
"may" exercise remedies under the Lease.  Like these earlier
letters, it is not evidence of an actual exercise of remedies.
It was no more than a threat.

Bloch's August 15, 2003 letter, on the other hand,
substantially differs from the previous notices in its clear
invocation of remedies.  That letter, signed by Hawkins, states
unambiguously "we are declaring the lease in default, terminating
the lease and requesting the fully accelerated balance of
$386,280.65 be paid immediately."  This causes the court to

14

conclude that the Lease was not terminated on July 13 and that BancPartners knew it was not terminated at that time, despite Hawkins' self-serving conclusion to the contrary in his deposition.  Rather, BancPartners terminated the Lease and accelerated the payments on August 15.

*Was the Exercise Timely?*

The next question is whether BancPartners' August 15 exercise of remedies occurred within two years of the Guaranty's execution (*i.e.*, on or before July 7, 2003) - which it clearly did not - or whether it occurred within 45-days of proper notice.

The parties dispute the legal implications of the four letters from BancPartners (or its counsel) to Bloch. Specifically, they disagree over which of these letters, if any, constituted proper notice of Material Default under the Guaranty.

In its January 21, 2003 letter, BancPartners writes "[d]ue to the property taxes not being paid, your Lease is in default, and we could declare it in default, accelerate all the remaining payments and demand payment in full immediately.  These are measures we do not want to take but are prepared to do so [sic] if necessary."

In the second letter, dated May 20, 2003, BancPartners wrote about the same unpaid property taxes:

> [i]n the event the delinquent payments have not been paid or
> satisfactory arrangements made for their payment we may
> accelerate the entire balance on the lease and demand payment
> of the total amount immediately.  We do not want to take
> these steps unless necessary and we hope that you will

cooperate with us by sending the delinquent payment or contacting us upon receipt of this letter.

The July 2, 2003 "notice of Default" letter states that "[a]n Event of Default exists under the Rental Agreement because (i) Lessee has not paid personal property taxes as required under Section 8 of the Rental Agreement and (ii) Lessee has not paid the Lessor's closing expenses incurred in connection with the closing of the Rental Agreement."

Finally, the August 15, 2003 letter states "we are declaring the lease in default, terminating the lease and requesting the fully accelerated balance of $386,280.65 be paid immediately."

BancPartners contends that the first two letters did not constitute notices of Material Default under ¶ 34 of the Guaranty for purposes of triggering its 45-day deadline for exercise of remedies under ¶ 34(b).  It distinguishes these earlier letters from its July 2, 2003 letter, which it says did constitute such notice under ¶ 34.  BancPartners notes that the July letter is specifically captioned "re: Notice of Default," and that it clearly states "a default exists under the Rental Agreement."

However, the Guaranty contains no requirement that the notice specifically use the words "notice of default," and BancPartners points to no authority requiring it.  Indeed, this court finds that the January 21 letter, like the May 20 and July 2 letters, was sufficient to put Bloch on notice of its default under the Lease.  Each of these three letters placed Bloch on notice that the late payments constituted a default and, in fact, BancPartners

specifically refers to the earlier letters as "notices" in its
briefs.

However, this court holds that the only one of these letters
that constitutes a "notice of a Material Default" for ¶ 34(b)
purposes is the January 21 letter that was <u>first in time</u>.  The
Guaranty provides that the termination date will be extended if
"Lessor has given notice of a Material Default to the Lessee and
thereafter commences the exercise of its remedies under Section 18
of the Lease within forty-five (45) days of *said notice*."
Guaranty, ¶ 34(b)(ii) (emphasis added).  This court does not
believe that this provision permitted BancPartners to give
multiple notices of Material Default, each of which extended the
deadline for Section 18 remedies for 45 days.  Rather,
BancPartners was entitled to choose the date on which it gave
Bloch notice of a Material Default, after which it had 45 days or
the balance of the two year term of the Guaranty to commence any
Section 18 remedies.  The date it chose was January 21, 2003, and
its subsequent notices were gratuitous redundancies.  Thus,
BancPartners had until either 45 days after January 21 or until
two years after the Guaranty's execution to commence Section 18
remedies.

Therefore, BancPartners did not exercise its Section 18
remedies before the Guaranty had expired.  Its first and only
exercise of Section 18 remedies occurred on August 15, over a
month after the Guaranty expired on July 7 and several months
after the 45-day time period had run.

In short, examining the record in the light most favorable to the non-moving party, in this case BancPartners, this court finds no genuine issue of material fact on the question of when and whether the Guaranty terminated and whether BancPartners timely exercised its remedies.  Therefore, this court finds that the Guaranty terminated on July 7, 2003 and that BancPartners did not exercise its remedies before the Guaranty's termination or within 45 days of its January 20 notice of Material Default.

### *Right to Return and Release of the Collateral*

Given this court's conclusion that the Guaranty expired before BancPartners withdrew the Collateral, and the fact that the record evidence is uncontroverted that BancPartners' only legal claim to the Collateral was through the Guaranty, this court declares that Sierra is entitled to the return and release of the Collateral.

### *Sierra's Recovery of Attorney's Fees for Breach of the Guaranty*

This court addresses the questions of whether BancPartners breached the Guaranty and whether the Guaranty entitles BancPartners to recover attorney's fees, *infra*, in its examination of Sierra's breach of contract and conversion claims.

### *Assignment of BancPartners' Lease Rights*

Finally, Sierra seeks declaratory judgment on the question of

whether BancPartners assigned its rights under the Lease to AmSouth and on the implications of any such assignment. Specifically, it seeks declarations on the question of whether, after the AmSouth Assignment BancPartners retained any rights under the Guaranty, the Collateral, or the Account.

The Advisory Committee Notes to Fed. R. Civ. Pro. 57 permit a court to decline declaratory relief when such relief "will not be effective in settling the controversy." Notes of Advisory Committee on Rules, Rule 57 (1934 Adoption). In his leading treatise, Professor Edwin Borchard notes that

> "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed."

Edwin Borchard, DECLARATORY JUDGMENTS 299 n.5 (2d ed. 1941), *cited with approval in McGraw Edison Co. v. Preformed Line Prods. Comp.*, 362 F.2d 339 (9th Cir. 1966); *Maryland Casualty Co. v. Boyle Constr. Co.*, 123 F.2d 558, 565 (4th Cir. 1941).

Here, it is useful to address the AmSouth Agreement only so far as it impacts the question of whether Bloch was in default for failure to pay back property taxes. It has already been concluded from the record that Bloch was required to pay back property taxes to BancPartners when invoiced. The only impact of the AmSouth Assignment on this was that it allegedly created some confusion in the mind of the Bloch leadership over which party to pay back

taxes to.  However, the record indicates that the first notice
Bloch received of the AmSouth Assignment came on January 24, 2003.
The default in question was Bloch's failure to pay property taxes
when they were invoiced more than three months earlier, on October
15, 2002, long before any such doubt is alleged to have arisen.

In all other respects, this court declines to address
Sierra's prayer for declaratory relief because such relief serves
no useful purpose in resolving this controversy.

**SIERRA'S CLAIMS AGAINST BANCPARTNERS AND AMSOUTH**

***Breach of Contract and Breach of Implied Covenants***

Sierra alleges that BancPartners breached the Guaranty and
implied covenants arising therefrom by failing to terminate the
Guaranty on July 7, 2003, two years after its execution, and by
withdrawing the Collateral on August 1, 2003.  This court has
held, *supra*, that the Guaranty terminated on July 7, 2003.  The
question remains whether BancPartners' seizure of the Collateral
after the Guaranty terminated breached the Guaranty or an implied
covenant of good faith and fair dealing.

It is worth noting that, had the Guaranty not been terminated
before the August 1, 2003 withdrawal,[2] BancPartners would have
been liable for breach of the Guaranty because it withdrew the
Collateral before BancPartners exercised its Section 18 remedies,

---

[2]In other words, if the notice of Material Default on July 2 had
triggered the 45-day clock under ¶ 34(b) of the Guaranty, the August
1withdrawal would have occurred both before the Guaranty had terminated and
before BancPartners commenced Section 18 remedies.

in contravention of ¶ 35. Under ¶ 35, "LESSOR SHALL NOT DEMAND PAYMENT FROM GUARANTOR OR PROCEED AGAINST THE COLLATERAL UNTIL SUCH TIME AS LESSOR SHALL HAVE COMMENCED THE EXERCISE OF ITS REMEDIES UNDER SECTION 18 OF THE LEASE AS A RESULT OF A MATERIAL DEFAULT." Guaranty, ¶ 35 (capitalization in original).  Thus, the August 15 exercise of Section 18 remedies two weeks after the withdrawal of the Collateral would have constituted a breach of Guaranty ¶ 35.

However, the Guaranty did terminate on July 7.  There is no evidence that, as of that date, BancPartners retained any duties to Sierra under the contract beyond the duty to pay expenses to the prevailing party in a dispute over the Guaranty.  *See infra*. In addition, nothing in the record suggests that BancPartners had a duty to "terminate" the Guaranty on July 7, as Sierra alleges. Rather, the Guaranty simply terminated on its own in the absence of an exercise of remedies or an extension due to a notice of Material Default.  Because there is no evidence indicating that BancPartners had a duty to affirmatively terminate the Guaranty on July 7 and because no evidence suggests that BancPartners retained any duties after the termination of the Guaranty on July 7, this court finds that BancPartners' withdrawal of the Collateral on August 1 did not constitute a breach of the Guaranty.

Similarly, BancPartners did not breach any implied covenant of good faith and fair dealing under the Guaranty, assuming that such an implied covenant exists under the law of Tennessee.  In addition to the absence of a contractual breach, no evidence in

21

the record supports a finding of bad faith BancPartners.

### *Conversion*

Sierra alleges that the withdrawal of the escrowed money Collateral by BancPartners constituted conversion.  Under Tennessee law, "[a] conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right."  *Barger v. Webb*, 216 Tenn. 275, 278, 391 S.W.2d 664, 665 (1965).

This court agrees with Sierra and finds that BancPartners' withdrawal of the Collateral constituted conversion under Tennessee law.[3]  BancPartners' appropriated the Collateral and exercised dominion over it by withdrawing it on August 1.  Because this appropriation occurred after the Guaranty had terminated and, therefore, after BancPartners' security interest in the Collateral had expired, the appropriation came in defiance of Sierra's right to the Collateral.  Indeed, the Collateral was assigned to Sierra for the term of the Guaranty only, and Sierra's use of the Collateral after its termination constituted conversion.

---

[3]It is worth noting that this court would reach the same result if it applied Alabama common law to Sierra's conversion claim.  BancPartners cites *Watters v. Lawrence County*, 551 So.2d 1011, 1014 (Ala. 1989) and *Ott v. Fox*, 362 So.2d 836, 839 (Ala. 1978) for the proposition that "[t]o constitute conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse.  The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's right, where the plaintiff has a general or special title to the property or the immediate right to possession."  Under this definition, this court would still find that BancPartners' withdrawal of the Collateral after the termination of the Guaranty constituted conversion.

In conversion actions in Tennessee, "the measure of damages is the value of property which is withheld by the defendant at the time of the conversion." *Barger*, 216 S.W.2d at 665.   In addition, a plaintiff is generally permitted to recover for "all injuries sustained as a natural and proximate result of defendant's wrong." *Lance Productions, Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 213 (Tenn. App. 1988).   In this case, there is no need to determine "value" because the Collateral consists of money.   Sierra is entitled to recover the amount of the Collateral, $96,500.   In addition, it is entitled to all interest that accrued, or should have accrued, on the Collateral through the date of its withdrawal by BancPartners on August 1, 2003, since the Collateral Assignment specifies that interest becomes part of the Collateral.   As of that date, the total of the Collateral, plus interest, was $99,120.00.   Sierra is also entitled to recover interest at the legal rate from the date of the conversion, August 1, 2003, to the present date, since the interest lost during this period naturally and proximately flows from BancPartners' conversion and since, in Tennessee, "the ordinary measure of damages for conversion is the value of the property converted at the time and place of conversion, with interest." *Crowe v. First American Nat'l Bank*, No. W2001-00800-COA-R3-CV, 2001 Tenn. App. LEXIS 950 (Tenn. App. 2001) (unpublished).   By statute, the prejudgment interest rate in Tennessee is left to the discretion of the trial judge relying on equitable principles, but it is not to exceed 10% per annum.

TENN. CODE ANN. § 47-14-123 (2005).  In this matter, the court is guided by the 6% per annum statutory prejudgment interest rate in Alabama.  ALA. CODE § 8-8-1 (2005).  It has been approximately 2.25 years since BancPartners' withdrawal of the Collateral.  Six percent interest on $99,120.00 principal, compounded annually for 2.25 years, amounts to $113,041.80.  The court will enter judgment in this amount by separate order.

Additionally, Sierra is entitled to recover attorney's fees. Attorney's fees are generally not available in conversion actions in Tennessee. *Carmical v. Kilpatrick*, 2002 Tenn. App. LEXIS 903 (Tenn. App. 2002) (unpublished) (citing *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998) ("an award of attorney's fees as part of the prevailing party's damages is contrary to public policy")).  However, this case is distinguishable in that attorney's fees are provided by contract. The Guaranty entitles the prevailing party to "recover all costs and expenses, including reasonable attorneys fees and litigation expenses, actually incurred" for any dispute that "arise[s] concerning the subject matter of this Agreement."  Guaranty, ¶ 22.

Although BancPartners' conversion took place after the Guaranty was no longer in effect, limiting this provision's applicability to the effective dates of the Guaranty simply does not make sense.  Contract disputes routinely occur after the contracts in question have expired, and a provision requiring the payment of fees for disputes "concerning the subject matter of the contract" must continue to apply for as long as such disputes

24

persist.  Here, the focus of this litigation has largely been the Collateral and the various provisions of the Guaranty that apply to the Collateral.  The Collateral, along with the Lease, is part of the subject of the Guaranty, and by any reasonable interpretation of the Guaranty language, this dispute "concerns" the Collateral and the Lease.  Therefore, Sierra is entitled to recover reasonable attorney's fees and all other costs and expenses actually incurred in this litigation.

Sierra is not, however, entitled to recover punitive damages because Tennessee courts award these "only in the most egregious of cases," and nothing in the record indicates that BancPartners engaged in the type of "intentional, fraudulent, malicious, or reckless conduct" required for punitive damages  *Boling v. Tennessee State Bank*, 890 S.W.2d 32, 36 (Tenn. 1994).


**Breach of Fiduciary Duty**

Sierra alleges that BancPartners breached its fiduciary duty not to execute on the Collateral unless there was a valid breach and to return the Collateral when the Guaranty expired. BancPartners responds that BancPartners and Sierra were in a debtor-creditor relationship and cites Alabama case law showing that no fiduciary relationship exists between debtors and creditors.  *Quick v. State Farm Mut. Auto. Ins. Co.*, 429 S.W.2d 1033, 1035 (Ala. 1983).  This court applies Tennessee law but reaches the same conclusion.  In Tennessee, as in Alabama, no

fiduciary relationship obtains between a debtor and a creditor. *Scott v. East Tenn. Production Credit Assoc. of Greenville*, No. 1106, 1987 Tenn. App. LEXIS 2929 (Tenn. App. 1987) ("a fiduciary duty does not exist in a normal debtor-creditor relationship.") (unpublished).  Here, BancPartners and Sierra are participants in a debtor-creditor arrangement.  Sierra was indebted to BancPartners for the Collateral amount for the duration of the Guaranty, and this indebtedness was in consideration for its sale of the Baler.  As debtor and creditor, the two parties had no fiduciary relationship.  Because BancPartners could not have breached a duty to Sierra that it did not have, this court holds that BancPartners did not breach a fiduciary duty to Sierra.


**SIERRA'S CLAIM FOR SUBROGATION AGAINST BLOCH**

Sierra's first amended complaint seeks damages for subrogation against Bloch.  Although Sierra does not seek summary judgment in its subrogation claim against Bloch, Bloch moved for summary judgment on the subrogation claim, and Sierra has not responded to Bloch's motion.

The subrogation claim arises from ¶ 11 of the Guaranty, which states: "Once the Guaranteed Obligations have been paid in full, Guarantor shall be subrogated to any rights of Lessor against Lessee until Guarantor shall have been repaid in full."  The plain language of this provision makes clear that any inchoate right of subrogation Sierra has does not ripen until the Guaranteed

Obligations have been paid in full.  This court, having declared, *supra*, that the Guaranteed Obligations have not been paid in full, finds that there is no genuine issue of material fact and that Bloch's motion for summary judgment against Sierra's subrogation claim is due to be granted.

**BANCPARTNERS' CROSS-CLAIM AGAINST BLOCH**

BancPartners has cross-claimed against Bloch for breach of the Lease.  BancPartners contends that Bloch breached the Lease by failing to pay rent, taxes, assessments, fees and/or penalties, including the reasonable costs incurred by BancPartners in collecting such amounts, including reasonable attorney's fees.  Specifically, BancPartners contends that Bloch failed to timely pay property taxes as required under the Lease and to timely pay closing costs according to the schedule set out in the Closing Invoice executed with BancPartners' law firm.

This court has held, *supra*, that Bloch breached the Lease agreement by failing to pay property taxes when invoiced in October 2002.  The court arrived at this holding despite Bloch's claims that BancPartners billed "fraudulent invoices."  For summary judgment purposes, Bloch has provided no evidence in support of its contention that these invoices were fraudulent.  In fact, it is unclear what Bloch means in describing them as fraudulent.  The court guesses that the invoices are alleged to be fraudulent because they were sent to Bloch before the taxes were

27

assessed by county tax assessors.  If this is the case, today's
holding on the question of Bloch's default, *supra*, acknowledges
that nothing in the Lease, the law or the record limits
BancPartners' freedom to bill taxes in advance.  On the question
of back taxes, therefore, Bloch's motion for summary judgment is
due to be denied and summary judgment granted on BancPartners'
cross-claim.

 Bloch also moves for leave from this court to amend its
answer to assert a cross-claim, in effect a counterclaim, against
BancPartners for allegedly fraudulent property tax invoices.
Bloch's motion to amend is found only within its motion for
partial summary judgment, filed August 10, 2005.  Although this
was after the deadline for responsive pleadings had passed, it
fell within the time allotted for potentially dispositive motions.
Fed. Rule Civ. Pro. 15(a) allows amendments to pleadings after the
deadline with the leave of the court, and instructs that "leave
shall be freely given when justice so requires."  Although this
standard for amendment is liberal, there is no reason to grant
Bloch's motion to amend here.  Bloch essentially alleges that the
invoices were inappropriately filed the year before they were due.
Bruce Bloch's deposition testimony, which is cited in Bloch's
motion to amend, makes this clear.  He suggests that the
"BancPartners invoice on which the alleged default was based was
for 2003, not 2002, and therefore not due."  This court has held
that, as a legal matter, BancPartners could invoice for property
taxes at any time.  Therefore, the allegedly fraudulent invoices

would not impact this court's holding in any way and, as a result, justice does not require this court to grant Bloch leave to amend its complaint even if it were timely.

The other part of BancPartners' cross-claim alleges that Bloch breached the Lease by failing to pay other costs required under the Lease.  This claim is based on the following Lease provisions:

> Lessee shall execute the documents or financing statements as Lessor deems to be necessary or advisable to evidence or assure the ownership interest of Lessor as Owner and shall otherwise cooperate and defend the title and interest of Lessor as Owner to the Equipment. Lessee agrees to pay all costs of preparing and filing any such documentation. Lease ¶ 14.

> [BancPartners] is not responsible for any injuries, damages, penalties, claims or losses, including legal expenses, incurred by Lessee or any other person caused by the transportation, installation, manufacture, selection, purchase, lease, ownership, possession, modification, maintenance, condition, operation, use, return or disposition of the Equipment. [Bloch] agrees to reimburse [BancPartners] for and defend and indemnify [BancPartners] against any claims for such losses, damages, penalties, claims, injuries or expenses.   Lease, ¶ 9.

BancPartners contends that Bloch's failure to pay certain fees required by these provisions, specifically its failure to timely reimburse BancPartners for closing costs, constitutes a breach of the Lease.  Bloch agreed to pay closing costs in the Closing Invoice, which included a line of text handwritten by Bloch's president stating "balance due in 3 installments."  Bloch maintains that the Closing Invoice was a compromise agreement "separate and apart" from the Lease and that Bloch's failure to

29

pay the costs at the time specified in the Closing Invoice does not constitute a default under the Lease.

With respect to this issue, this court finds that there are genuine issues of material fact. Specifically, the question remains whether the Closing Invoice is indeed separate and apart from the Lease or whether the two documents are essentially connected, such that a violation of the terms of the Closing Invoice constitutes a default under the Lease. However, because this court has already held that an Event of Default occurred, and because the presence or absence of an additional default will not impact this holding or the award of remedies, trial on this question is not necessary.

Section 18 of the Lease permits BancPartners to exercise "any or all" of a variety of remedies in the event Bloch defaults. By its August 15, 2003 letter, BancPartners terminated the Lease, accelerated the obligation and demanded immediate payment of the accelerated balance of $386,280.65. However, credited against this balance is the amount of rental fees, presently unknown to this court, that Bloch has paid to date to BancPartners. Therefore, the court will by separate order enter judgment against Bloch in favor of BancPartners for $386,280.65, minus Bloch's rental payments since August 15, 2003, plus prejudgment interest since that date at Alabama's statutory prejudgment interest rate of 6% per annum. ALA. CODE § 8-8-1 (2005).

In addition, BancPartners is entitled to recover attorney's fees from Bloch stemming from the breach of the Lease, as provided

in the Lease's "Personal Guaranty" provision.  This issue remains
to be resolved.


**AMSOUTH'S MOTION FOR SUMMARY JUDGMENT**

AmSouth seeks summary judgment against Sierra on all counts.
No evidence in the record indicates that AmSouth directed
BancPartners to take any of the actions that form the basis for
the allegations in Sierra's first amended complaint.  This court
agrees that the briefs present no genuine issue of material fact
and that AmSouth's motion for summary judgment is due to be
granted in its entirety.  It follows that Sierra's motion for
summary judgment against AmSouth will be denied.


### *Conclusion*

The cross-motions for summary judgment are due to be granted
in part and denied in part by entry of a separate and appropriate
order in accordance with the above opinion.

DONE this 15th day of November, 2005.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE